UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

                                                    DECISION AND ORDER
            v.                                         05-CR-313A

LUTHER HAYES,

                                    Defendant.

### INTRODUCTION

         The defendant, Luther Hayes, is charged in a three-count indictment with: (1) unlawfully possessing a firearm and ammunition as a convicted felon, in violation of 18 U.S.C. § 922(g)(1); (2) unlawfully possessing a firearm while being a user of a controlled substance in violation of 18 U.S.C. § 922(g)(3); and (3) possession of cocaine base, in violation of 21 U.S.C. § 844(a).  The charges arose from a traffic stop during which the defendant was found in possession of the gun, ammunition and drugs. The defendant moved to suppress the evidence arguing that the traffic stop was made without reasonable suspicion because the police relied solely upon an anonymous tip. The motion was referred to Magistrate Judge H.  Kenneth Schroeder.  After holding a suppression hearing, Magistrate Judge Schroeder recommended that the motion be denied.

1

The defendant filed objections to Magistrate Judge Schroeder's report and recommendation and the government filed a response in opposition to the objections. On June 11, 2008, this Court held oral argument.  After reviewing the submissions and upon hearing argument from the parties, the Court finds that the motion to suppress must be granted.

## **BACKGROUND**

The facts relevant to the traffic stop are largely undisputed.  On November 5, 2005, at 3:55:50 a.m., an unidentified male placed a call to a civilian 911 operator to report that a man driving a grey truck with license number CYY-3614 had a weapon. The caller reported that he had seen the man with the weapon in front of the "86ers" night club on Broadway in Buffalo and that he had "flagged down a Charlie District [patrol] car[1] and told them the driver of a vehicle had a weapon" but that the police car had driven away in the wrong direction.  The caller gave a description of the man and described the gun as a 9 mm handgun.  The 911 operator told the caller that she would convey the information to the police dispatcher.

A police radio transmission went out several minutes later reporting that "a person with a gun in a grey truck" with license number CYY-3614, and bearing the physical description given by the anonymous caller, had been seen in front of the 86ers night club.  The dispatcher indicated that she "[didn't] know where the call came from; no complainant."  Notably, the caller's claim to have "flagged down a Charlie District"

---

[1]  The parties agree that the caller's reference to a "Charlie District" patrol car means a Buffalo Police patrol car in the "C" Police District.

patrol car was never conveyed from the civilian 911 operator to the police dispatcher.

Several minutes later, the anonymous caller again called 911 and this time was transferred directly to the police dispatcher.  During the second call, the caller reiterated that he had seen a man in a "grey and black Explorer" in front of the 86ers night club with a 9 mm gun, which was now traveling southbound on Spring Street, from Broadway.  The caller described his own car as a black "like a Pontiac grand am type" vehicle and stated that he was following the truck down Spring Street.  As the caller remained on the phone trying to describe the direction that the grey truck was heading, the caller then stated "they got him" to the dispatcher, meaning that the responding officers  had pulled over the grey truck.  At no time before the traffic stop did the caller identify himself or provide any identifying information other than describing his own vehicle as a black "like a Pontiac Grand Am type" car that was heading in the same direction as the grey truck.  After the vehicle was pulled over, the 911 dispatcher asked the caller to "stop and talk to the police" and the caller refused stating that he knew the driver and was afraid of him.  The caller did not say how he knew the driver.  The dispatcher asked the caller for his cell phone number, which the caller gave, but then specifically stated that, although the police could call him and he would talk to them, he did not want to be a complainant.

At some point before the truck was pulled over, the police learned that the license given by the anonymous caller was incorrect because it was associated with a Cadillac 4-door sedan, not a Ford explorer.  As it turns out, the actual plate number for

the truck was off by one digit.[2]  The police did not observe any traffic violations being

committed by the defendant's vehicle or any criminal activity by the defendant.[3]

        After the truck was pulled over, the police saw that the driver of the truck

matched the physical description that the caller had given.  Buffalo Police Officer

Shawn Adams, one of the officers on the scene, testified that he asked the defendant

to step out of the truck, the defendant complied, he patted the defendant down for

weapons, handcuffed him and placed him in the back of the police cruiser.  Officer

Adams did not find any weapons or contraband on the defendant as a result of the pat

down, but that another officer on the scene, Officer Kean, reported seeing a bullet on

the driver's side of the vehicle.  Another officer, Officer Wagner, shone his flashlight

inside the truck and saw a gun in the center console.  The gun was a .45 automatic

pistol.  The gun was retrieved and the vehicle was searched.  The officers found crack,

marijuana and ammunition in the center console of the truck which they testified was

located "right on top in plain view."

        The defendant was arrested and subsequently charged with the charges in the

pending indictment.


## DISCUSSION

        The defendant argues that suppression is warranted under the Supreme Court's

decision in Florida v.  J.L., 529 U.S. 266 (2000), which held that an anonymous tip by

---

    [2]  The actual plate number was 3674, not 3614.

    [3]  Indeed, at the suppression hearing, the government conceded that the stop was
based solely on the 911 call.  Tr.  of Suppression Hrg, at 7.

an unknown informant standing alone is insufficient to support reasonable suspicion for a <u>Terry</u> stop.[4]  In that case, the Supreme Court addressed the reliability of an anonymous tip reported to the Miami-Dade police that a "young black male standing at a particular bus stop and wearing a plaid shirt was carrying a gun."  <u>Id.</u>  at 268.  The police knew nothing about the informant. Two officers responded within minutes of the tip and found three black males standing at the bus stop.  One of the three, J.L., was wearing a plaid shirt.  "Apart from the tip, the officers had no reason to suspect any of the three of illegal conduct. The officers did not see a firearm, and J.L. made no threatening or otherwise unusual movements." <u>Id</u>.  One of the officers approached J.L., told him to put his hands up, frisked him, and seized a gun from him. The second officer frisked the other two individuals and found nothing.  The Supreme Court held that an anonymous tip that a person is carrying a gun, without more, is insufficient to justify a police officer's stop and frisk of that person.  The Court explained  that the report of a man with a gun did not provide the officers with the required indicia of reliability because

> the anonymous call concerning J.L. provided no predictive information and therefore left the police without means to test the informant's knowledge or credibility. That the allegation about the gun turned out to be correct does not suggest that the officers, prior to the frisks, had a reasonable basis for suspecting J.L. of engaging in unlawful conduct. The reasonableness of official suspicion must be measured by what the officers knew before they conducted their search. All the police had to go on in this case was the bare report of an unknown, unaccountable informant who neither explained how he knew about the gun nor supplied any basis for believing he had inside information about J.L.

---

[4]  <u>See</u> <u>Terry v.  Ohio</u>, 392 U.S. 1 (1968).  There appears to be no dispute that the initial stop of the defendant's vehicle qualified as a "<u>Terry</u> stop" requiring reasonable suspicion.

<u>Florida v. J.L.</u>  529 U.S. at 271.  In reaching its holding, the Court distinguished the

facts in J.L. from the facts in <u>Alabama v. White</u>, 496 U.S. 325 (1990):

> In <u>White</u>, the police received an anonymous tip asserting that a woman
> was carrying cocaine and predicting that she would leave an apartment
> building at a specified time, get into a car matching a particular
> description, and drive to a named motel. Standing alone, the tip would not
> have justified a <u>Terry</u> stop. Only after police observation showed that the
> informant had accurately predicted the woman's movements, we
> explained, did it become reasonable to think the tipster had inside
> knowledge about the suspect and therefore to credit his assertion about
> the cocaine. Although the Court held that the suspicion in <u>White</u> became
> reasonable after police surveillance, we regarded the case as borderline.
> Knowledge about a person's future movements indicates some familiarity
> with that person's affairs, but having such knowledge does not necessarily
> imply that the informant knows, in particular, whether that person is
> carrying hidden contraband. We accordingly classified <u>White</u> as a "close
> case."

<u>Id.</u>  at 270-71 (internal citations omitted).  The essential fact distinguishing <u>White</u> from

<u>J.L</u>. was that the anonymous tip contained "predictive"  information (i.e. information

predicting the defendant's future movements) that the police were able to independently

verify before stopping the defendant.  The Court explained that "there are situations in

which an anonymous tip, suitably corroborated, exhibits 'sufficient indicia of reliability to

provide reasonable suspicion to make the investigatory stop.'"  <u>Id.</u> at 327.  In <u>White</u>, the

"corroboration" was the predictive information that the police were able to independently

verify.  In this case, there was no such predictive information.  The tip contained only

descriptive information that described the defendant's movements as they were

occurring.  Therefore, the facts of this case are more analogous to <u>J.L.</u> than to <u>White</u>.

   Nevertheless, the Magistrate Judge distinguished the facts of this case

from <u>J.L</u>. on the ground that the tipster in this case was not wholly anonymous.  Citing

<u>United States v.  Elmore</u>, 482 F.3d 172 (2d Cir. 2007), the Magistrate Judge found that

the tipster qualified as a "partially known citizen informant" because he had provided the

police with identifying information about himself.  In Elmore, the Second Circuit

explained that where some information is known about an informant and the informant

is not wholly anonymous, a lesser degree of corroboration is required in order to find

the tip reliable.  The Court explained:

> informants do not all fall into neat categories of *known* or *anonymous*.
> Instead, it is useful to think of known reliability and corroboration as a
> sliding scale. Where the informant is known from past practice to be
> reliable . . . no corroboration will be required to support reasonable
> suspicion.  Where the informant is completely anonymous . . . a significant
> amount of corroboration will be required. However, when the informant is
> only partially known (i.e., her identity and reliability are not verified, but
> neither is she completely anonymous), a lesser degree of corroboration
> may be sufficient to establish reasonable suspicion.

Id.  at 181 (emphasis in original).  The Magistrate Judge found that, as in Elmore, the

caller in this case was partially known because the police knew: the caller's cell phone

number, that the caller was following the defendant's truck in a Black Pontiac Grand

Am, and that the caller had had a face-to-face encounter with the police before calling.

      The facts of Elmore are quite different from the facts in this case.  The tipster in

Elmore had given the police sufficient identifying information about herself to hold her

accountable if the tip turned out to be false.  Specifically, the Elmore tipster had

provided police with her name and cell phone number and identified herself as a former

girlfriend of the defendant.  She also provided police with detailed information about a

prior incident involving defendant Elmore, and the police were able to verify the

accuracy of her account through police records.  The Second Circuit found that,

although the tipster had insisted on remaining anonymous, she had provided the police

with "enough information about herself to allow [the police] to identify her and track her down later to hold her accountable if her tip proved false." Id. at 192.  Importantly, the police were able to independently corroborate much of the information that had been provided in the tip *before* stopping the defendant's vehicle.

Unlike Elmore, the tipster in this case never identified himself to the police and in fact insisted on remaining anonymous.[5]  Although ultimately he did give the police his cell phone number, he did not do so until *after* the defendant's vehicle had been pulled over.[6]  Because the cell phone number was not provided *before the stop occurred*, it could not have played any role in the officer's assessment of the caller's reliability. Indeed, in contrast to the considerable amount of identifying information that had been provided to the police by the tipster in Elmore, all that was known about the tipster in this case was that he was driving a black "Pontiac Grand Am type" vehicle which was following in the direction of the defendant's vehicle.  Such a generalized description of the tipster's vehicle - without more - is insufficient to distinguish this tipster from the

---

[5]  The fact that the tipster remained anonymous distinguishes this case from that of an *identified* private citizen informant whose veracity is generally presumed in the absence of circumstances suggesting that they should not be trusted.  See Elmore, 482 F.3d at 180 (citing Caldarola v. Calabrese, 298 F.3d 156, 165-66 (2d Cir.  2002)); see also United States v. Christmas, 222 F.3d 141 (4th Cir.  2000) (finding that a tip from citizen informant who had provided police with her home address in a face-to-face encounter was sufficiently trustworthy and more reliable than the anonymous tip at issue in J.L).

[6]  The Magistrate Judge found that it was never clarified at the hearing as to when or at what time the police dispatcher had relayed information about the caller leaving his number to Officer Adams.  See Report and Recommendation, at 5, n.3.  The government suggests that the caller gave his cell phone number as the defendant's vehicle was being pulled over.  The parties provided this Court with the audio recordings of the anonymous calls and it is clear to this Court that the caller did not provide his cell phone number to the police dispatcher until *after* the police had stopped the defendant's vehicle.  The caller states to the dispatcher "they got him" (meaning the police are pulling him over) and only then did he provide the dispatcher with his cell phone number.

wholly anonymous tipster in <u>J.L.</u>  In other words, the tipster in this case was, at the time of the <u>Terry</u> stop, wholly anonymous to the police.

In addition to the tipster's cell phone number, the Magistrate Judge also relied upon the fact that the tipster here had engaged in a "face-to-face confrontation" with the police.  The Second Circuit has explained that, a "face-to-face informant must, as a general matter, be thought more reliable than an anonymous telephone tipster, for the former runs the greater risk that he may be held accountable if his information proves false."  <u>United States v. Salazar</u>, 945 F.2d 47, 50-51 (2d Cir.1991).  Indeed, a face-to-face encounter provides the officer with an opportunity to assess the unknown informant's demeanor and credibility, something that is lacking in an anonymous telephone call.  The Magistrate Judge found that the existence of this face-to-face encounter was a critical fact that distinguishes the facts of this case from <u>J.L.</u>

The Magistrate Judge's reliance on the face-to-face confrontation is problematic for two reasons.  First, the government presented no direct evidence that the face-to-face encounter had actually occurred.  Rather, all that was presented during the suppression hearing was the tipster's *own claim* - contained in his first anonymous phone call - stating that he had just "flagged down a Charlie District" police car.  The tipster did not testify at the suppression hearing.  Nor was there any testimony from the officers who purportedly had been flagged down by the tipster.  There was no radio transmission from the "Charlie District" vehicle or any other evidence presented to support the tipster's claim that the face-to-face encounter had occurred.  All that was presented was the audio tape from the caller to the 911 operator claiming that had just flagged down a Charlie District police car.

9

Second and more importantly, however, the tipster's claim that he had "flagged down" another police vehicle was never conveyed by the civilian 911 operator to the police dispatcher.  In United States v.  Colon, 250 F.3d 130 (2d Cir. 2001), the Second Circuit held that a civilian 911 operator's knowledge could not be imputed to the dispatching or arresting officers for the purposes of assessing whether reasonable suspicion exists absent any evidence that the 911 operator was trained to make a reasonable suspicion assessment.  The information concerning the purported face-to-face encounter was never conveyed by the civilian 911 operator to the police dispatcher or arresting officers.  Nor was there any evidence suggesting that the civilian 911 operator was trained to assess whether the police had reasonable suspicion.  Because the information was never conveyed to any law enforcement officer, under Colon, the imputed knowledge doctrine does not apply and any claim of a face-to-face encounter could not have played a role in the responding officers' assessment of reasonable suspicion.

With the tipster's cell phone number and purported face-to-face encounter are eliminated from the reliability analysis, the only identifying information that the officers had about the anonymous caller was that: (1) he was traveling in a black Pontiac Grand Am type vehicle; and (2) that his vehicle was following in the direction of the defendant's.  In the Court's view, this information is insufficient to transform the tipster from a completely anonymous caller into a partially known informant.  "All the police had to go on in this case was the bare report of an unknown, unaccountable informant....," J.L., 529 U.S. at 271, which contained merely descriptive and no predictive information. Under all of the circumstances, the Court find that the facts of this case are governed

10

by the Supreme Court's holding in J.L. and that the police lacked reasonable suspicion to conduct the Terry stop.[7]

## **CONCLUSION**

Accordingly, the Court declines to adopt Magistrate Judge Schroeder's Report and Recommendation and, for the reasons stated herein, grants the defendant's motion to suppress evidence seized as a result of the Terry stop on November 5, 2005. The parties shall appear in Court for a status conference on Monday, July 28, 2008, at 9:00 a.m.

SO ORDERED.

s/ *Richard J. Arcara*
HONORABLE RICHARD J. ARCARA
CHIEF JUDGE
UNITED STATES DISTRICT COURT

DATED:  July 23, 2008

---

[7]  The government cites United States v.  Bold, 19 F.3d 99 (2d Cir.  1994), and United States v.  Walker, 7 F.3d 26 (2d Cir.  1993), for the proposition that the police officer's verification of descriptive information contained in an anonymous tip is sufficient to justify a Terry stop.  That proposition is no longer valid in light of the Supreme Court's holding in J.L, which was decided after the Second Circuit's rulings in Bold and Walker.

11